IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2011

**STATE OF TENNESSEE v. CHANCY JONES**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-02131     W. Mark Ward, Judge**

_____

**No. W2010-02424-CCA-R3-CD  - Filed April 5, 2012**

_____

Following a jury trial, the Defendant, Chancy Jones, was convicted of second degree murder
and sentenced to twenty-four years of incarceration.  On appeal, the Defendant challenges
the trial court's exclusion of certain orders of protection, which had been sought and entered
against the victim by persons unrelated to this case, and which the Defendant sought to admit
in an effort to prove that the victim was the first aggressor. The trial court held that the orders
of protection themselves were not relevant, but offered the Defendant the opportunity to
introduce the testimony of the persons who obtained the protective orders against the victim.
For his second issue, the Defendant challenges the sufficiency of the evidence supporting his
conviction.  After a careful review of the record, we affirm the judgment of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE
and ALAN E. GLENN, JJ., joined.

Joseph A. McClusky (on appeal) and Thomas E. Hansom (at trial), Memphis, Tennessee, for
the appellant, Chancy Jones.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney
General; Amy P. Weirich, District Attorney General; Patience Branham and Robert W.
Ratton, III, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## General Background Facts & Procedure

The State's proof established that in the early morning hours of September 9, 2008, a female was found dead inside a blue Chevrolet Impala at a Shell gas station located at 1709 Whitten Road in Memphis. Police officers who responded to the scene testified that the victim appeared to have sustained three gunshot wounds. After finding the victim's purse, officers tentatively identified her as Phyllis Malone. This identification was later confirmed through fingerprint analysis. Police officers did not find a weapon or shell casings at the scene. Neither did they find the victim's cell phone. Lieutenant Barry Hanks[1] of the Memphis Police Department ("MPD") testified that inside the victim's purse he found a three-page handwritten letter addressed to someone named "Chancy." Lieutenant Hanks said that the letter was unsigned, undated, and he could not tell whether it had been mailed. The letter indicated that the victim had been to a doctor and was pregnant.

Lieutenant Walter Davidson, MPD, notified the victim's next of kin. He went to the home of Ophelia Harris, one of the victim's sisters. Lieutenant Davidson asked the victim's family whether they knew someone named "Chancy." Harris told him that the victim had been dating an "Officer Jones," but she apparently did not know Officer Jones' first name. Later that same day, Harris told Lieutenant Davidson that she had spoken with her neighbor, who was also a police officer, and that the neighbor had told her that he knew a police officer named Chancy Jones.

MPD Officer Chancy Jones ("the Defendant") reported to duty on September 9, 2008, for his regular shift at 2:00 p.m. He was a patrolman and spent the early part of his shift responding to calls. Lieutenant Davidson and Deputy Director Toney Armstrong, then commander of the MPD's Homicide Bureau, went to the Defendant's precinct to question him about the victim's death. Deputy Director Armstrong asked the Defendant whether he knew Phyllis Malone, and the Defendant replied that he knew someone named "Phyllis Walker." Lieutenant Davidson testified that from his conversations with the victim's sisters, he knew the victim sometimes called herself Phyllis Walker.[2] The Defendant was relieved of duty and taken to the homicide office for questioning. Deputy Director Armstrong informed the Defendant that he was a suspect in a homicide investigation, advised him of his

---

[1] Lieutenant Hanks was a sergeant with the homicide bureau at the time of the offense.

[2] Cynthia Brown, a sister of the victim, testified that the victim sometimes used different last names, including Walker, Harris, and Malone. Walker was apparently the last name of one of the victim's former boyfriends.

Miranda rights, and the Defendant signed an advice of rights form. The Defendant indicated that, as a police officer, he was aware of his rights, and he did not request an attorney.

Deputy Director Armstrong and Lieutenant Davidson then questioned the Defendant. The Defendant told them that he met the victim at an apartment complex while he was responding to a call. According to the Defendant, the two exchanged phone numbers, and while the relationship was initially just friendly, it developed into a sexual one. He told the officers that the sexual relationship extended only to oral sex, not intercourse. The Defendant said that the last time he spoke with the victim was the night before her death, but he told the officers that he could not recall what they spoke about. According to Deputy Director Armstrong, the Defendant then began to give vague answers. The Defendant initially denied knowledge about the victim's homicide. However, when Deputy Director Armstrong told the Defendant that he did not believe he was being truthful, the Defendant subsequently admitted responsibility for the victim's death.

According to Deputy Director Armstrong's testimony at trial, the Defendant told him that the victim had informed the Defendant that she was pregnant and wanted money for an abortion or else she would tell the Defendant's wife.[3] The Defendant told the officers that he met with the victim at the gas station on Whitten Road and that they had gotten into an argument over whether he would pay for an abortion. The Defendant told the officers that the victim became angry and threatened to tell his wife, and at that point, he shot her.

After this initial police interview, the Defendant provided a formal, written statement. The written statement was admitted as an exhibit at trial and, in pertinent part, provides as follows:

Q: Are you the person responsible for the death of Phyllis Malone?

A: Yes.

. . . .

Q: On Monday, September 8, 2008, did you have a conversation with Phyllis earlier in the evening?

A: Yes.

---

[3] The Defendant testified that he was separated from his wife at the time of his relationship with the victim.

Q: Describe the content of that conversation.

A: She had said she wanted to meet with me when I got off and I told her I didn't know what time I was gonna get off [be]cause I was downtown at 201 [Poplar]. She had called and I told her I would call her back on the time frame or when I got off because I didn't know what time I would be getting off.

. . . .

Q: Later in the evening, did you meet with Phyllis?

A: Yes.

Q: Where and when did you meet Phyllis?

A: At Shell gas station on Whitten Road.

. . . .

Q: What time did you meet her?

A: Maybe around 11:00 p.m.

Q: In your own words, tell me the events that occurred before, during, and after this incident occurred.

A: We met there. We had a conversation about her having the abortion done and also she kept questioning if I was going to pay for the baby's insurance. She got upset when I answered the question I was going to think about it. She became irate, cursing, threatening, and blackmailing saying that she was going to tell my wife and take me to child support and I had to pay the white man at juvenile court. I talked to her and she calmed down and she wanted a hug or what not. After that, the conversation picked back up. She asked me the same question again and I told her I would think about it. Then she said "Well I'll just go and tell the wife" and said all I was gonna pay for. She said "You'll pay in the long run." After that, she got in her car. She started fussing again. She said "Well I'll just see you at your house tomorrow." I asked her why would she do that. She said since I didn't have an answer for her, that's what she was gonna do. So when I asked her about going to get the abortion done, she cursed and said hell n[o] she wasn't gonna do that. She was determined

-4-

that she was going to tell her and come to my house. I asked her not to do it. She said "Bye Chancy." That's when I pulled out a pistol and I shot her.

Q: How many times did you shoot her?

A: Two or three times.

Q: Where were you when you fired the shots?

A: Standing outside of her car on the passenger side.

. . . .

Q: What type and caliber weapon did you use?

A: .38 Rossi revolver that I kept in the truck.

Q: Where is the .38 now?

A: Thrown in the river.

Q: Did you take anything from the victim's car or person?

A: Cell phone.

Q: Why did you take her cell phone?

A: [Be]cause I knew she had been calling and texting me.

Q: What did you do with the cell phone that you took from Phyllis?

A: Threw it in the river.

MPD Sergeant James Max searched the Defendant's patrol car. He found only work-related items and did not find any evidence related to the shooting. Likewise, police officers searched the Defendant's home and personal vehicles. While officers found multiple guns and ammunition in these locations, they did not find a .38 caliber weapon, ammunition, or holster. Neither did they find the victim's cell phone or other evidence related to the shooting. Officers did not attempt to retrieve the gun used in the shooting or the victim's cell phone from the river where the Defendant claimed to have disposed of them.

Three of the victim's sisters testified regarding interactions they witnessed between the victim and the Defendant. One of the victim's sisters, Samantha Malone, testified that the victim lived with her. Samantha[4] testified that she last saw the victim on the night of her death at approximately 9:45 p.m. She said that the victim was in a "good mood," but the victim did not tell her that she was going to meet the Defendant.

Cassandra Malone, another sister of the victim, testified that she heard the victim talking with the Defendant over the telephone using a speaker-phone two or three times. About three or four weeks prior to the victim's death, Cassandra heard the victim tell the Defendant that if he wanted to keep the baby, she would have it, but that if he did not, she would need money to pay for an abortion. In a statement to police, Cassandra told them that she did not believe the victim was pregnant because the victim had told Cassandra that her "tubes were tied."

The victim's sister, Cynthia Brown, testified that she heard the victim on the phone with a person whom the victim identified as "Mr. Jones." Brown testified that the first such occasion occurred approximately one month before the victim's death.[5] She said that she overheard the phone call because the victim had put it on speaker-phone. In this phone conversation, the victim told "Mr. Jones" that she needed money for an abortion. According to Brown, when the victim told "Mr. Jones" that if she did not get money she would tell his wife, "Mr. Jones" responded, "Don't play with my family" and hung up the telephone.

Brown testified that she last saw the victim at around 11:00 p.m. on the night of her death. The victim was driving Brown to work in a blue Chevrolet Impala. Brown testified that the victim was "dressed up," had just "had her hair done," and was in a "good mood." According to Brown, at approximately 10:50 p.m., the victim received a call from "Mr. Jones." This phone call was not on speaker-phone, and Brown could only hear the victim's side of the conversation. Brown heard the victim tell "Mr. Jones" that if he did not give her money for an abortion she would tell his wife. Brown testified that she did not think the victim was pregnant because "she had her tubes tied," but Brown did not ask the victim whether she was actually pregnant. Brown said that the victim dropped her off at work at approximately 11:00 p.m. and that the victim told "Mr. Jones" that she would meet him at 11:20 p.m.

---

[4] A number of the witnesses share the same last name. Where necessary for clarity, we will sometimes refer to these witnesses by their first names only. We intend no disrespect.

[5] In an earlier statement to police, Brown said that this phone call was approximately one week before the victim's death. On cross-examination, she stated that she did not recall the exact day of the phone call.

The Defendant's cell phone records were admitted into evidence. These records showed that the Defendant received calls from a phone number identified as the victim's at 9:13 p.m., 9:53 p.m., 10:46 p.m., and 11:33 p.m. on September 8, 2008. An engineer employed by the Defendant's cell phone company testified that he analyzed which cell towers were used to make these phone calls. By determining which cell towers were utilized by the Defendant's and victim's cell phones, he could determine the location of the Defendant's cell phone at the time of the call. He testified that at the time of the final phone call at 11:33 p.m., the Defendant's cell phone was located at 1709 Whitten Road, the address of the Shell gas station where the victim's body was found.

Dr. Lisa Funte, a medical examiner at the Shelby County Regional Forensics Center, testified as an expert in forensic pathology. She testified that the victim's cause of death was multiple gunshot wounds. According to Dr. Funte, one bullet entered the right side of the victim's head, a second bullet entered the right side of the victim's chest, and a third bullet also entered the victim's chest. Dr. Funte opined that the head wound and one of the chest wounds would have each been fatal, but that the other chest wound would not have been fatal. She could not determine the order of the gunshot wounds. Based on her analysis of the gunshot wounds, Dr. Funte surmised that the two gunshots to the victim's chest were probably fired from a few feet away. Dr. Funte was unable to make such a determination regarding the head wound because the victim's hair blocked the deposition of soot and gunshot residue necessary for her analysis.

Officer Anthony Mullins, a homicide investigator with the MPD, testified regarding blood stains found in the victim's vehicle. Officer Mullins explained that the blood splatter in the passenger seat of the victim's vehicle indicated to him that the seat was not occupied at the time the victim was shot. Officer Mullins surmised that the shooter was standing outside of the vehicle and shooting through a rolled-down front passenger-seat window. He confirmed that there were no bullet holes in the windshield or passenger-side window, which indicated to him that the passenger-side window was open during the shooting. Officer Mullins did not observe the vehicle itself, but instead based his testimony on observation of crime scene photos.

The defense's proof consisted of the Defendant's own testimony. He acknowledged causing the victim's death and gave the following recitation of events leading to her death. The Defendant met the victim in July 2008 while on patrol, and they exchanged phone numbers. They began a sexual relationship that was limited to him receiving oral sex. However, soon, the victim told the Defendant that she was pregnant and needed money for an abortion. When he questioned her pregnancy because they had not had sexual intercourse, she told him that she had kept his sperm in her mouth following oral sex and had taken it to a doctor and been artificially inseminated. The Defendant said that the victim was

threatening him and his family by telling him that if he did not give her money she would tell his wife about their affair.

On September 8, 2008, the Defendant agreed to meet the victim at her request. They arranged to meet after his patrol shift ended at approximately 11:00 p.m. The Defendant said that the victim arranged the meeting location and that he had never met her at the Shell gas station before. He arrived before she did, and when she arrived, she parked beside his truck. The Defendant said that he got out of his truck and approached the victim who was in her car. The Defendant had a .38 revolver in his pocket, but he testified that its presence was unrelated to their meeting. He explained that he had left his service weapon in his locker at the precinct. When he was off-duty he carried a .38 revolver for personal protection, which he usually left in his personal vehicle during his shift. As was his habit, when he left work he put the .38 revolver in his pocket.

The Defendant said that the victim initially remained in her car but eventually got out. They talked for approximately one hour. According to the Defendant, the victim was asking him for money for the baby's insurance and telling him that she was not going to have an abortion. He testified that, "I told her I would think about it. And at that point, she became irate, loud, threatening, and blackmailing me, saying about I would pay in the long run, if you don't do this, if you don't give me this, that I would pay." When asked by defense counsel to clarify, the Defendant said that:

> She threatened to do harm to me and she threatened to do harm to my family. She said that you don't know me. You don't know what I would do and she threatened to harm me. She said that I would run over you. She said – well, her words were, I will run over your ass if you don't do what I ask you to do.

The Defendant then described the circumstances leading to the shooting:

> Well, eventually, she got back in her car. About the time the conversation was over with, she had got back in her car, fastened her seatbelt, and the car was running, and as I got ready to leave, I walked from in front of her on the passenger's – her driver's side, and I walked in front of her car going to my vehicle, about the time I got almost clear of her vehicle, she revved up her engine and she had already told me she was going to run over me, she revved up her engine. I reacted, I took two steps and I pulled my weapon and I fired.

The Defendant fired "a couple of times" through the passenger-side window without taking aim. He said that he "fired in reaction," and his "instincts just took over." According to the Defendant, he believed that the victim would run over him with her vehicle, and he

feared for his life. The Defendant said that when the victim revved her engine, he "jumped to clear her vehicle, took two steps, came out of my pocket and I fired." After shooting the victim, the Defendant reached into her car, took the keys out of the ignition, and dropped them onto the floorboard. He also took her cell phone and left. When asked why he did not call an ambulance or the police, he replied that he "panicked." He said that he rode around for a while before throwing the gun and cell phone into the river. He then went back to his house and "[d]azed around the house in shock." He said that he reported to work the next day but was simply "going through the motions."

The Defendant maintained that, when he was arrested and interviewed by Deputy Director Armstrong and Lieutenant Davidson, he told them that the victim threatened to run him over with her car. He testified that when his written statement was taken, the police did not ask him about the victim's threats. The Defendant explained that this was the reason his written statement did not portray that he acted in self-defense. The Defendant acknowledged that the questions and answers reflected in the written statement were accurate. However, he asserted that, when giving the written statement, he had not been asked to clarify what he meant when he said that the victim had been "irate, cursing, threatening, and blackmailing." Lieutenant Davidson testified that, although he understood each of these words to mean different things, he understood them each to refer to the victim threatening to tell the Defendant's wife about the extra-marital relationship, not physical harm. Deputy Director Armstrong testified that the Defendant never told him that he was afraid of physical harm from the victim.

The Defendant sought to introduce evidence that the victim had committed prior acts of violence. Specifically, the Defendant sought to introduce the victim's conviction for aggravated assault in 2002 and certain orders of protection that had been sought and entered against the victim by persons unrelated to this case. The Defendant argued that this evidence supported his claim of self-defense as corroboration that the victim acted as the first aggressor. The trial court admitted the aggravated assault conviction through the stipulation of the parties. However, regarding the orders of protection, the trial court determined that the orders themselves were not relevant to specific instances of violence by the victim. The court reasoned that the protective orders could have been entered for some reason other than a violent act committed by the victim, and that without the underlying factual basis supporting the entrance of the orders, the orders were not relevant. Rather than admitting the orders of protection themselves, the trial court stated that it would permit the Defendant to establish the factual basis for the orders of protection through the testimony of the persons who had obtained the protective orders against the victim. However, the Defendant was unable to procure these witnesses' testimony.

The Defendant was charged with first degree murder and employing a firearm during the commission of a felony. Tenn. Code Ann. §§ 39-13-202; 39-17-1324(b), (i)(1). The jury was instructed on self-defense and on the lesser-included offenses of first degree murder, including second degree murder and voluntary manslaughter. After deliberations, the jury convicted the Defendant of second degree murder and acquitted him of the charge of employing a firearm during the commission of a felony. Following a sentencing hearing, he was sentenced to twenty-four years of incarceration. On appeal, he argues that the evidence was insufficient to support his conviction and that the trial court erred in excluding the prior orders of protection entered against the victim.

## Analysis

### *Admissibility of Orders of Protection Entered Against the Victim*

The Defendant first argues that the trial court erred when it limited the introduction of certain orders of protection that had been sought and entered against the victim by persons unrelated to this case. The Defendant sought to introduce the orders as evidence of specific acts of violence by the victim to corroborate his theory that the victim acted as the first aggressor. The trial court excluded the protective orders on the basis of relevance, but the court allowed the Defendant to prove the factual basis for the protective orders through the testimony of the persons who obtained them. The Defendant was unable to procure these witnesses, but asserts that the orders should have been admitted nevertheless.

A trial court is afforded broad discretion regarding its decisions on the admissibility of evidence, and we will review those decisions under an abuse of discretion standard. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008); State v. Looper, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003). We will find an abuse of discretion only "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Banks, 271 S.W.3d at 116.

We note initially that, following the trial court's ruling, the Defendant did not proffer the orders of protection that he wished to introduce into the record. Thus, in addition to lacking the testimony of the persons who sought the protective orders, we do not have the orders themselves to review. The transcript contains some vague discussions between counsel and the trial court regarding the factual basis for the orders of protection; however, these discussions are unclear and do not constitute proof in any event. On appeal, we are simply unable to ascertain the underlying factual basis supporting the orders of protection. Thus, we are left only to speculate as to the precise nature of the excluded evidence. An offer of proof is necessary to "ensure effective and meaningful appellate review." State v.

Hall, 958 S.W.2d 679, 691 n.10 (Tenn. 1997); Tenn. R. Evid. 103(a)(2). By failing to include the excluded orders of protection in the appellate record or otherwise convey their nature to the appellate court, the Defendant has waived review of this issue. Tenn. R. App. P. 13(c); Tenn. R. App. P. 36(a).

Nevertheless, having reviewed the record before us, we are of the opinion that the trial court did not err in excluding the orders of protection. The general rule is that a defendant may use evidence of specific prior acts of violence by the victim against third parties to corroborate the defendant's theory that the victim was the first aggressor. State v. Ruane, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995); see also Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, TENNESSEE LAW OF EVIDENCE § 4.04[5][d] (5th ed. 2005). The defendant need not be aware of the victim's prior violent acts at the time of the alleged self-defense in order to use the evidence for the limited purpose of corroborating the defendant's self-defense claim.[6] Ruane, 912 S.W.2d at 781-82. However, the evidence is not to be used substantively, and because it is for corroborative purposes only, is not governed by Tennessee Rules of Evidence 404(a)(2) and 405. State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *36 (Tenn. Crim. App. Sept. 22, 1997); see also Cohen et al., *supra*, at § 4.04[5][d].

Before a trial court allows evidence regarding specific instances of violence by the victim to corroborate the defendant's theory of self-defense, three requirements must be satisfied: (1) there must be proof that the defendant acted in self-defense, and the issue may not merely be raised by the arguments of counsel; (2) the trial court must determine whether there is a factual basis underlying the defendant's allegations that the victim had first-aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the potential for unfair prejudice. State v. Wayne Robert Wait, No. E2010–01212–CCA–R3–CD, 2011 WL 5137178, at *12 (Tenn. Crim. App. Oct. 28, 2011), perm. app. denied, (Tenn. March 7, 2012) (citing State v. Billy Joe Henderson, No. 03C01–9804–CR–00139, 1999 WL 398087, at *6 (Tenn. Crim. App. June 18, 1999)).

Here, the trial court determined that the issue of whether the Defendant acted in self-defense was duly raised by his testimony. However, in determining whether a factual basis

_____

[6]A different scenario is presented when a defendant seeks to use such evidence to establish the defendant's own fear of the victim. To be admissible as substantive evidence of the defendant's state of mind, the defendant must testify that he or she was aware of the victim's prior acts of violence against third parties at the time of the alleged self-defense. See State v. Hill, 885 S.W.2d 357, 361 n. 1 (Tenn. Crim. App. 1994); see also State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *36 (Tenn. Crim. App. Sept. 22, 1997). In this case, the Defendant concedes that he was unaware of the victim's prior acts of violence at the time he claims to have acted in self-defense.

existed for the Defendant's claim that the victim had first-aggressor tendencies, the trial court excluded the orders of protection as not relevant, and the Defendant could produce no other relevant evidence.

To be admissible, evidence must be relevant. Tenn. R. Evid. 402. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. We agree with the trial court that while the Defendant was entitled to present the testimony of witnesses to the victim's prior violent acts to corroborate his theory that the victim was the first aggressor, the orders of protection themselves were not competent on this issue. Rather, like the trial court, we conclude that the orders of protection were not relevant on the issue of the victim's first-aggressor tendencies without some evidence regarding the factual basis supporting the protective orders.

As conveyed to the trial court, the protective orders did not detail their underlying factual basis. That is, the trial court had no way of knowing whether the orders were entered because of a specific violent act of the victim or for some other non-violent reason. Even if the orders of protection were entered because of a violent act of the victim, this fact does not necessarily mean that the victim had first-aggressor tendencies. See, e.g., State v. Latteral Jolly, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993) (noting that "[t]he mere fact that one has a conviction on his record, does not necessarily prove that he was the first aggressor," and that "[r]ather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression").

Without establishing the factual basis for the protective orders, the Defendant cannot show their relevance. In this regard, we note that the trial court allowed the Defendant to establish the alleged prior violent acts of the victim through the testimony of the persons who obtained the orders of protection; however, the Defendant could not procure their testimony. From our review of the record, the trial court accurately set out the relevant law, carefully limited the evidence that it deemed not relevant, and allowed the Defendant the opportunity to prove the facts underlying the orders of protection through the testimony of the persons who obtained the orders against the victim. Accordingly, we conclude that the trial court did not abuse its discretion in excluding the orders of protection.

*Sufficiency of the Evidence*

The Defendant next contends that the evidence was insufficient to support his conviction for second degree murder. He first argues that the State did not carry its burden

of rebutting his claim of self-defense. He also argues that the jury should have found him guilty of voluntary manslaughter instead of second degree murder. For the reasons stated below, we disagree.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). The same standard of review applies to guilty verdicts whether based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). It is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Our Supreme Court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2006); see Brown, 311 S.W.3d at 431. Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

In this case, the Defendant testified that he acted in self-defense. At the time of the victim's death, the relevant Tennessee statute on self-defense provided that a person is justified in using deadly force if: "(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2008). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the Defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). A claim of self-defense presents a question of fact for the jury. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

Upon our review of the record, we conclude that the evidence is sufficient to sustain the Defendant's conviction for second degree murder. Taken in the light most favorable to the State, the proof establishes that the Defendant knowingly fired three gunshots at the unarmed victim through the passenger-side window of her vehicle, killing her. This evidence was corroborated through the Defendant's own admissions. This Court has held that deliberately firing several shots at a person constitutes "knowing" conduct for purposes of establishing second degree murder. See, e.g., State v. Rickie Reed, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *5-6 (Tenn. Crim. App. Oct. 31, 2002); State v. Michael Clark, No. W2009-01649-CCA-R3-CD, 2011 WL 300211, at *3 (Tenn. Crim. App. Jan. 21, 2011), perm. app. denied (Tenn. May 25, 2011).

The Defendant claimed at trial that he acted in self-defense, and the jury was accurately instructed on the law of self-defense in effect at the time of the offense. The Defendant claimed that the victim became upset with him, "revved up her engine," and threatened to run over him with her car. However, he admitted that he shot the victim through the passenger-side window, which implies a position of safety and weakens his claim that he feared imminent death or serious bodily injury. Likewise, while the Defendant claimed that he "came out of [his] pocket" firing without aiming, the State presented evidence that the Defendant shot the victim three times, two of which were fatal shots to the head and chest. Lastly, we note that the Defendant claimed at trial that he told Deputy Director Armstrong and Lieutenant Davidson that he was in physical fear of the victim, a fact which is not reflected in his written statement and denied by the officers. To the extent that his testimony at trial differed from his statements to police, it was the jury's prerogative to resolve these discrepancies. Whether the Defendant acted in self-defense was a question of fact for the jury. Goode, 956 S.W.2d at 527. The jury's verdict clearly discredited the Defendant's testimony and resolved the facts in favor of the State. The jury rejected the Defendant's self-defense claim, and we will not disturb its verdict on appeal. Winters, 137 S.W.3d at 655.

The Defendant next asserts that the proof establishes that he committed voluntary manslaughter rather than second degree murder. Our criminal code provides that "[v]oluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2006). As noted, the jury was instructed on the lesser included offense of voluntary manslaughter as well as the distinction between voluntary manslaughter and second degree murder. It is well-settled that it is up to the trier of fact to determine whether a homicide constitutes second degree murder or voluntary manslaughter. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); State v. Sentorya L. Young, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *6 (Tenn. Crim. App. May 12, 2008). When the evidence is sufficient to support a second degree murder conviction, we will not disturb the jury's decision in this regard.

In sum, we conclude that the evidence is sufficient to sustain the Defendant's conviction for second degree murder, and he is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JEFFREY S. BIVINS, JUDGE